**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

J.L., a minor, by and through his next friend Meghan Smith,

Plaintiff(s),

v.

ACADEMY SCHOOL DISTRICT 20

Defendant(s).

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff, J.L., a minor, by and through his next friend and mother Meghan Smith ("Ms. Smith") hereby respectfully files this action against Defendant Academy School District 20 ("Academy District 20" or "Defendant"), through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows. This action seeks injunctive relief and appropriate damages.

## I. JURISDICTION AND VENUE

1. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Federal question jurisdiction arises under the Constitution and laws of the United States of America,
2. Plaintiff J.L. is a resident of El Paso County, Colorado.
3. Defendant Academy District 20 has its principal place of business in El Paso County, Colorado.
4. Venue is proper pursuant to 28 U.S.C. § 1391(b) as the wrongful acts alleged by the plaintiff occurred in whole or in part in Colorado.

## 5. BACKGROUND FACTS

6. J.L. is a child with a disability within the meaning of the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12101 *et seq.*

7. J.L. suffers from Attention Deficit Hyperactivity Disorder ("ADHD"). Specifically, J.L. suffers from impulsivity, a recognized ADHD symptom.[1]

8. J.L.'s impulsivity causes him to make quick decisions when stimulated, without considering the consequences of those decisions.

9. To help manage his ADHD, J.L. is subject to a 504 Plan which provides accommodations for his disability at school. *See* Section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794 *et seq.* (hereinafter "Section 504").

10. J.L. is currently in 10th grade and, until recently, was educated at Liberty High School ("Liberty" or School"), within Academy School District 20 ("Academy 20" or "District").

11. Until recently, apart from a single incident in middle school, J.L. had no significant prior disciplinary history at Liberty.

12. Despite this, J.L. was summarily expelled from Liberty on February 29, after a minor incident on February 26, 2024.

13. That day, J.L. and a friend, G.M., were leaving Liberty's campus for lunch when G.M. opened his trunk to retrieve some belongings from his trunk.

14. When G.M. opened the trunk, J.L. observed an Orbeez toy that is loosely shaped like a gun, but is obviously a toy. Without thinking, J.L. grabbed the toy from the trunk and fired an Orbeez water pellet at G.M.

---

[1] *See* American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, 5th edition. Arlington, VA., American Psychiatric Association, 2013*, available at* https://www.cdc.gov/ncbddd/adhd/diagnosis.html

15. Orbeez are small water-absorbent beads that are popular children's toys. When exposed to water, the beads swell, becoming soft and squishy.

16. Orbeez are toys that allow children to shoot the soft beads like water balloons at one another. Orbeez toys are typically clearly marked as toys. They bear orange barrel tips and are frequently painted vibrant neon colors.

17. Orbeez toys are comparable to Nerf guns in both their use as toys and their appearance. The photos below provide a visual comparison.




Orbeez



Nerf

18. When J.L. saw the Orbeez toy he immediately recognized it as a toy.

19. Importantly, J.L. understood that the Orbeez was a toy and that it was not dangerous. His ADHD manifested through the impulsive decision to grab the toy and discharge a bead.j

20. When J.L. discharged the bead, no other students were present or involved.

21. After discharging the bead, J.L. and G.M. returned the Orbeez toy to the trunk and left campus for lunch.

22. When the boys returned to school, several other kids were in the parking lot.

23. Once G.M. parked, J.L. walked away from the car to speak with other students in the next parking row.

24. While J.L. walked away, a third boy, C.M., walked over to G.M.'s car. C.M. also observed the Orbeez toy, and similarly recognized it as a toy. C.M. recovered the Orbeez toy and fired it at another mutual friend K.M.
25. At the end of the lunch period, C.M. returned the Orbeez toy to G.M.'s car.
26. The children in the parking lot then returned to school.
27. At that time, none of the children acted as if they felt unsafe or threatened. None suffered any injuries nor were any 911 calls generated or received. The School also did not enter lockdown or otherwise take any safety precautions. The children involved simply returned to class.
28. Several hours later, at approximately 2:00 p.m., J.L. was removed from class and taken to Kaitlyn Epperson's ("Epperson"), office.
29. Epperson, Liberty's Dean of Students, told J.L. he had been recorded on video with a gun on school property.
30. Epperson then ordered J.L. to write a confessional statement. J.L. wrote a statement explaining that he had been in the parking lot when students were playing with the Orbeez toy after lunch.
31. When Epperson was unsatisfied with this statement, she dictated an additional sentence stating, "I was shooting the Orbiz [sic] gun, before lunch, in the parking lot, with [G.M]."
32. Epperson held J.L. in her office from 2:00 to 3:00 p.m. During that time Epperson did not contact J.L.'s parents. Epperson also continued to hold J.L. even though school ended at 2:30 p.m.

33. At approximately 3:00 p.m., Epperson finally contacted J.L.'s parents. Epperson informed them that J.L. had been suspended for possession of a dangerous weapon and directed his mother, Meghan Smith ("Ms. Smith"), to pick him up.

34. When Ms. Smith arrived, Epperson refused to release J.L. until Ms. Smith signed J.L.'s written statement.

35. Neither Epperson nor any other School personnel provided J.L.'s parents with any of the alleged evidence against him or any documentation of the suspension or relevant policies.

36. J.L.'s initial suspension cited three alleged violations of Academy 20 policy:

    a. "[B]ehavior on or off school property which is detrimental to the welfare or safety of others . . ."

    b. "[S]erious violations in a school building or on school property, including but not limited to possession of a dangerous weapon . . ."

    c. "[R]epeated interference with the school's ability to provide educational opportunities to other students."

37. The initial suspension lasted for five days; however, the School issued an immediate recommendation for a further five-day extension followed by expulsion.

38. On February 28, 2024, J.L.'s parents requested the discipline referral packet from the School; however, it was not provided.

39. The afternoon of the 28th, J.L.'s parents attended a scheduled Manifestation Determination Review ("MDR"). J.L.'s parents again requested the discipline packet and were again denied.

40. Those present at the MDR include the following:

    a. Desiree Lovato, Multi-Tiered System of Supports Coordinator

b. Laura Miles, Teacher

c. Christina Bartlett, Teacher

d. Sarah Ricci, Assistant Principal

e. Kristin Bendig, Counselor

f. Kaitlyn Epperson, Dean of Students.

41. J.L.'s parents were also present including Ms. Smith, James Smith ("Mr. Smith), J.L.'s step-father, Justin Longfellow ("Mr. Longfellow"), J.L.'s father, and Joyleen Longfellow ("Ms. Longfellow"), J.L.'s step-mother.

42. The parents requested that Epperson be removed from the meeting based on her prior involvement. The parent's request was denied.

43. In reviewing J.L.'s disability and current accommodations, the MDR team noted that he has a tendency to rush his work and blurt out statements.

44. The MDR team also noted that J.L. had only one prior disciplinary incident that year, a warning for an unexcused absence on October 21, 2023, which the J.L.'s parents noted was a doctor's appointment.

45. J.L.'s parents emphasized that J.L. struggles with impulse control and attempted to explain that, by grabbing the Orbeez toy, J.L. was exhibiting an impulsive behavior.

46. J.L.'s parents particularly highlighted that J.L.'s conduct was specifically linked to the fact that the Orbeez gun was a toy. They explained that J.L. would never have possessed or used a real weapon on School grounds; however, because the Orbeez was a toy, J.L. did not think about the possible consequences when he grabbed it from G.M.'s trunk.

47. Accordingly, the fact that the toy was not a real weapon was critical for understanding J.L.'s thought-process and the effect of his ADHD in his decision-making. Impulsively,

J.L. saw a toy while he was with his friends and grabbed it. Had the toy been a real weapon, J.L.'s would not have felt the same impulse to use or possess it.

48. When J.L.'s parents attempted to explaint the connection between J.L.'s ADHD and the incident, the MDR team refused to discuss anything related to the incident itself.
49. J.L.'s teachers, Laura Miles ("Miles") and Christina Bartlett ("Bartlett") noted previous manifestations of J.L.'s ADHD.
50. Miles noted that J.L. struggled to maintain focus and often wandered off track. However, she explained that he was not disruptive and was a very respectful student.
51. Bartlett, similarly, noted prior experiences where J.L. acted impulsively. She explained that she had experienced J.L. disrupting class by blurting out statements at inappropriate times and that he has "difficulty thinking through things before acting."
52. The experiences related by Miles and Bartlett should have shown that J.L. tends to act without thinking, and that his impulsivity increases when stimulated. However, despite the connection between J.L.'s previous behavior and the incident, the School's manifestation focused exclusively on the fact J.L.'s current accommodations were designed to support J.L.'s focus in class rather than on regulating impulsive behavior.
53. The MDR-team, led by Dr. Lovato, argued consistently that because J.L.'s 504 focused on attention deficits in class rather than regulating impulsivity, the impulsivity J.L. displayed was not a manifestation of his disability.
54. Accordingly, the MDR team determined that J.L.'s conduct was not a manifestation of his ADHD over the objections of his parents.
55. After the MDR, Liberty maintained J.L.'s expulsion.
56. Academy 20 provided notice of the expulsion on March 5, 2024.

57. While J.L. was expelled, G.M. returned to school.

58. After J.L. was expelled, Academy 20 provided his parents with a copy of the “dangerous weapons” policy it used to justify J.L.’s expulsion.

59. The dangerous weapons defined in the policy bear no resemblance to the Orbeez gun at issue.

60. Specifically, the policy defines a firearm as a weapon designed “to expel a projectile by the action of an explosive.”

61. The Orbeez toy has no capacity to project projectiles by explosion.

62. The policy similarly prohibits the possession of pellet, BB guns, or other devices “designed to propel projectiles by spring action or compressed air.”

63. The Orbeez themselves, which are soft, squishy, water beads, are entirely distinct from BBs or pellets used in compressed air rifles.

64. The blanket policy regarding any object “used or intended to inflict death or serious bodily injury . . .” is similarly inapplicable to an Orbeez toy, which fires gel beads that are essentially water balloons.

65. Furthermore, the Orbeez gun also does not fall within the “firearm facsimile[]” policy, because no reasonable person could mistake a neon toy with an orange tip for an actual firearm.

66. Accordingly, the policy applied to J.L far exceeds the facts of his actual offense.

67. Furthermore, Academy 20 discriminated against J.L. by applying this policy to expel him while allowing G.M. to return to school.

68. G.M. and J.L. are both children of the same age and class cohort. They were also accused of the same or similar conduct. The only differences between the two are that G.M. has a better academic record than J.L., and that J.L. is disabled within the meaning of the ADA.

69. Accordingly, J.L. and G.M. are similarly situated individuals who engaged in the same underlying conduct, but who received profoundly different punishments.

70. Comparing G.M. and J.L.'s circumstances reveals that Academy 20 punished a disabled child more harshly than a non-disabled child, when both were accused of the same conduct.

71. Based on the expulsion, J.L. has been rendered ineligible to attend any general Colorado public high school.

72. Moreover, his disciplinary record now shows that he bore a dangerous weapon on school property. That record will follow J.L. throughout the rest of his public education, including out of state.

73. For J.L. to continue to receive an education, he must now enroll in an alternative school or seek education out of state. However, his expulsion record will continue to follow him even if he seeks a non-Colorado education.

74. Expelling J.L. subjects him to irrevocable harm.

75. J.L. is a child on the cusp of adulthood. His social and emotional development are in a critical transition between childhood and adulthood.

76. J.L. is at a crucial stage of adolescence. A stage where individuals develop into themselves and experiment with their identities. For many, these actions result in misconduct or mistakes that they would not make if they were older or wiser. J.L. is just such a child.

77. The combination of J.L.'s age and his disability make him uncommonly susceptible to impulsive thinking and actions.

78. That those actions have now resulted in his expulsion from high school has created an irreparable harm to J.L.'s continued social development and mental health.

79. J.L. can now no longer receive the same quality of education anywhere in the state of Colorado due to this expulsion.

80. Furthermore, he will also irreparably be deprived of the social cohort that he built, through academics, extracurriculars, and social activities.

81. To continue high school, at a non-expulsion school, J.L.'s parents are now forced to look out of the state of Colorado. Fortunately, opportunities may be available in his father's home state of Maryland but realizing those opportunities will require J.L. to leave behind his entire developmental history.

82. J.L. has suffered all of this over a momentary impulse to play with a child's toy.

## II. CLAMS AND CAUSES OF ACTION

### A. FIRST CLAIM FOR RELIEF
### (*VIOLATION OF THE AMERICANS WITH DISABILITIES ACT*)

83. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

84. Plaintiff's conditions alleged herein constitute disabilities protected under the Americans with Disabilities Act.

85. Academy 20 had knowledge of the Plaintiff's disabilities.

86. Academy 20 had knowledge that the Plaintiff engaged in the same conduct as similarly situated non-disabled children.

87. Academy 20 punished Plaintiff far more severely than his similarly situated non-disabled peers.

88. Plaintiff, nor his actions at the heart of this dispute, poses any direct threat to himself or others within Academy 20.

89. Academy 20's violations of Plaintiff's rights under the Americans with Disabilities Act have denied him equal access to its programs and has caused Plaintiff to suffer irreparable harm.

## B. SECOND CLAIM FOR RELIEF
### *(VIOLATION OF THE EQUAL PROTECTION CLAUSE)*

90. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

91. Plaintiff is disabled within the meaning of the ADA, establishing him as a member of a discrete minority subject to the Equal Protection Clause of the U.S. Constitution. *See, Bd. of Trs. of Univ. of Ala. v. Garret*, 531 U.S. 356, 367 (2001) (subjecting claims of disability discrimination to rational basis review).

92. The decision to expel Plaintiff while reinstating G.M. for the same conduct is not supported by" any reasonably conceivable state of facts that could provide a rational basis for the classification." *Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1099 (10th Cir. 2020) (internal citations and quotations omitted).

93. Plaintiff's expulsion subjects him to disparate treatment from his non-disabled peers who engaged in the same or similar conduct and were not expelled.

94. Lacking a rationale basis for the disparate treatment, the Defendant's discriminated against Plaintiff based on his disability in violation of the Equal Protection Clause.

## C. THIRD CLAIM FOR RELIEF
### *(VIOLATION OF SECTION 504 OF THE REHABILITATION ACT)*

95. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

96. Plaintiff is disabled within the meaning of the ADA.

97. "Disability discrimination claims under Section 504 of the Rehabilitation Act are governed by the substantive standards for disability discrimination claims under the [ADA] . . ." *Cline v. Clinical Perfusion Sys.*, 92 F.4th 926 (10th Cir. 2024).

98. Plaintiff is otherwise qualified to remain in school, as evidenced by G.M.'s return.

99. The only distinction between the Plaintiff and G.M. is Plaintiff's learning disability.

100. The Defendant is a public entity.

101. By reinstating similarly situated students while expelling Plaintiff for the same conduct, the Defendant discriminated against Plaintiff in violation of Section 504.

## III. REQUEST FOR RELIEF

Plaintiff requests that the Court enter judgment in his favor and against Defendant Academy 20 as follows:

102. Granting Plaintiff injunctive relief pursuant to 42 U.S.C. § 12188(a)(2) by issuing an order:

    a. Rescinding Defendant's expulsion from all district and state schools.

    b. Enjoining Defendant from any further violation of the ADA.

103. Awarding Plaintiff damages for personal suffering and mental and emotional distress;

104. Awarding Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action;

105. Awarding the Plaintiff any additional and further relief that the Court finds equitable, appropriate, or just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

*<u>/s/Igor Raykin</u>*
Igor Raykin, Esq. #43081

Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846
E-mail: igor@coloradolawteam.com
Attorney for Plaintiff

*/s/Conor O’Donnell*
Conor O’Donnell, Esq. #58077
Kishnevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846
E-mail: conor@coloradolawteam.com
Attorney for Plaintiff